Good afternoon. Illinois Appellate Court First District Court is now in session. The Sixth Division, the Honorable Justice Carl Anthony Walker presiding, case number 23-1672, People v. Terry Rodgers. Good afternoon, everyone. I am Justice Carl Walker, and I have with me today Justice Aurelia Paczynski and Justice Celia Gamreth. What we'd like to do now is have each one of you to introduce yourselves, those who will be arguing. We'll start with the appellant. And appellant, if you could tell us how much time, if any, you would like to reserve for rebuttal. Chris Evers Of course, Your Honor. My name is Chris Evers. I'm the Office of the State Appellate Defender. I'd like to reserve three minutes of my time for rebuttal, please, Your Honor. Rodgers Sure. Thank you, Mr. Evers. And Mr. Van Dunn? Zach Van Dunn Hi, Your Honor. This is Zach Van Dunn for the state. Rodgers Okay. Each one of you will have a total of 20 minutes for your argument. If the justices are still asking questions, it may go beyond that 20 minutes because we generally don't cut each other off. But if nobody's asking you questions, once you get to the 20 minutes, I will stop you. Okay. So, Mr. Evers, if you want to go ahead and get started. Evers Thank you very much, Your Honor. Good afternoon, and may it please the court. Today, I would welcome any direction or questions from the court if there is one particular aspect of this case you'd like me to focus on. Otherwise, I'm planning to take the three arguments we presented in the order that they appeared in our briefing. Rodgers Well, I think you should probably go ahead and focus on Strickland. Let's start there. Evers Well, that would be my first thought. Of course, Your Honor. Rodgers Sure. Division of Performance and Prejudice. Let's start there. Evers Yes, Your Honor. There was a substantial showing made. The Strickland standards, of course, are well established of being the two prongs there. The first prong of the objectively unreasonable assistance. Here, my client told his attorney shortly after he was arrested that a possible witness of Frederick Washington was he saw leaving the vehicle that the deceited Mr. Heath was in and that they should investigate. And ultimately, they did nothing about that. This was an eyewitness, which was going to be a self-defense case, and they did nothing about that. I know, contrary to the state's assertions, though, the idea that the trial attorneys could make a strategic decision not to find Mr. Washington, not to rely on him, and they contemplated and planned the theory of defense is belied by the fact that if they did not investigate, there can be no strategic decision. And that's a long-held proposition of Illinois laws. They've got to take some kind of step for that. And why this is so important, moving to the second step of prejudice, is that he was prejudiced by not having the powerful testimony of Frederick Washington presented to the fact finder at this trial, because Washington said that he was in the car with Mr. Heath. And this is not a friend of my client or a family member that 10 years later comes out of the woodwork and says, oh, I was there and I saw everything. This is someone who was associated with the man who was killed that day, who said, contrary to the state's other evidence, that I saw Mr. Heath have a gun. I was with Mr. Heath when he was looking for people who had shot a family member earlier in the day, that Mr. Heath saw those people, drew a handgun, began firing while he was still driving, tried to make a U-turn and crashed, exited the passenger, exited, sorry, the driver's side from where he was driving and continued to shoot. All of that. Efforts. So that sounds important, but why did it take your client so long to come forward with that? We read through the first direct appeal with Crankle, hearing your client was very specific. There were four witnesses who supposedly counsel didn't investigate. It strikes me that your client certainly would have put in Washington with that group of four. And that's the difference between the witnesses you discussed at the pro se post-trial motion. He had affidavits from all four of those people. Those are people he was associated with. He knew what they would have said. He was able to tell his attorneys, this is what they would have said. And his attorneys actually did interview them, had statements that he got through discovery and they looked at. Mr. Washington was not a friend or we have any knowledge. He had no idea what they were going to say. And so his knowledge of what Washington would say came in the form of the affidavit that he attached to his pro se post-conviction petition filed approximately two months after this court affirmed his conviction and sentenced on direct appeal. But just saying to the court in a post-trial motion for a preliminary crankle, your honor, I saw a man, he might be able to help my case. And that's it. That's not going to be something that shows potential neglect because he doesn't know. Now, we know as of 2016, when the affidavit was procured and through the nine years process, we've been waiting to get to at least an evidentiary hearing. Hopefully that's the difference is because he could have said the name. Yes. But just saying the name of potential witness with nothing else cannot succeed at a preliminary crankle hearing, which is why the circuit court aired when it said, oh, that claim was forfeited because he could have brought the name up, but it made no attempt to look at the distinction between the claims he did bring up of those witnesses. And the fact that statements were produced, they were reviewed, and there was a discussion back and forth and that that did not exist for Mr. Washington and this court. Yes, your honor. So in response to that, the state cites people versus Johnson and people versus Mark, where the court said defending could have raised the challenge at the, you know, direct appeal and didn't, this is forfeiture. How is that different? Well, again, forfeiture on direct appeal is based on the information and knowledge inside the direct appeal record. There's no dispute here that this affidavit wasn't in the direct appeal record. There's no possible way for it to have been brought up by an attorney on appeal. It wasn't. They did challenge the crankle. I'm sorry, your honor. If you began the question, I did not mean to overspeak you. My apologies. There was nothing in the crankle. There was nothing in the direct appeal record. It could have been forfeited because it couldn't have been brought up. And that's kind of, I guess, the fallacy of the concept that a pro se defendant immediately after conviction before sentencing in a pro se motion has to have knowledge to bring up every potential claim they might want to bring up in post, in a post-conviction petition. And then if they can articulate it, bring it up, even though it won't be well supported. Now, through the post-conviction act, which our legislator enacted for this very reason of information outside of the record to be brought forward, this is the time where it is properly brought forward. And that's why the circuit court erred for the forfeiture and its misunderstanding of supposed contradiction between the affidavit and Mr. Rogers' petition. Mr. Rogers said that Mr. Washington be willing to testify. His affidavit and its final sentence says that he would testify if called to do so about everything in the affidavit. Agreed that in Mr. Rogers' own affidavit about what he spoke to his attorney shortly after his arrest, he said nothing about Mr. Washington being willing to testify. But of course, he didn't know. He had no idea what Mr. Washington would say. And that's why he asked his attorneys to go investigate, which just underscores that their failure to do so reinforces the prejudice that he suffered and which could have brought a very reasonable probability of a different context at trial if all this evidence is there, not only for the contradiction of State Witness Harris, but importantly, the shell casings. There were three groupings of shell casings. Six of those were nine millimeters around the front passenger side door of the car that Mr. Heath was in. And that matches the testimony of Mr. Washington about Mr. Heath firing first from while driving the car and then exiting that driver's door. That puts those casings in a very different context that the fact finder at trial never heard about, and the parties were never able to argue different theories. And would they? So the court made the point to say we don't think or know if Washington would testify. He said he was scared. He didn't come forward. What makes us think now he would testify? Well, his affidavit says that he would. First and foremost, it says that if called to do so, I will testify. The fact that he provided the affidavit in the first place shows that. And even his statement that he was scared to come forward doesn't say that he wouldn't have testified. It just says that's why he mostly didn't run to the police and explain it. And certainly given that the trial was more than four and a half years after the shooting, if he had been interviewed, investigated, he might have been willing to testify and or subpoena it. We don't know, Your Honor, which is actually, frankly, another reason for this issue and then the actual innocence issue. While an evidentiary hearing would be the best way to cut through some of this fog that we have about the information available, the affidavit is very powerful. And if you don't mind, I'm going to transition to the second issue, the actual innocence. Well, before you do that, Mr. Evers, I want to just come back to the, we know that Mr. Washington was not contacted by counsel. Was there a strategic decision? Has there been anything that you know of as to why he may not have contacted Mr. Washington? Your Honor, there's nothing in the record. The only information we have is the affidavit, frankly, of Mr. Rogers. I told my attorneys and they didn't do it. There's nothing discussing Mr. Washington, as I certainly admit, was discussed at the pro se motion for new trial about that. But why they chose not to do that, I don't know. But since they didn't contact him, it couldn't have been strategic of not a reason to contact him. The only thing they knew is that he left the car that Mr. Heath was in, but that in and of itself is not a strategic reason not to at least learn what he would say. That getting as much information as possible is always helpful, especially in an eyewitness, and when this is a self-defense case about who was shooting at who first. Okay, please move on to the actual innocence claim. Okay, so the actual innocence claim is there. Your Honor, albeit it's very short. It's two sentences, but Mr. Rogers' petition very clearly laid out each of his separate claims in a separate paragraph. Actual innocence was discussed after the ineffective assistance of counsel, and it said that the affidavit he attached contradicted the court's theory of the plan. It was newly discovered. The court's theory of the plan was the finding of guilty by the circuit court where it found that Mr. Rogers, with two unknown other individuals, had a plan to shoot Mr. Heath, and that it would have changed the outcome. That is certainly the gist of an actual innocence claim, right? It's right there, and why we say that this petition, along with the affidavit, has made that substantial showing. Really, the only two parts of the actual innocence kind of analysis that are in dispute are newly discovered evidence and conclusive character, as there's no really discussion about there. It is material, and it's non-cumulative. It is newly discovered, because the focus of that analysis is not whether the identity of potential witness is known before trial. It is the evidence itself, which is the testimony of Mr. Washington, and we learned of that in the affidavit that was executed in June of 2016, a decade after the shooting, more than five and a half years after the trial. That's newly discovered. The fact that Mr. Washington told his attorneys about Mr. Frederick Washington beforehand doesn't make his revelation of his testimony a decade later somehow. They would have known that. That's the whole point of why he asked them to investigate. They chose not to. They were ignorant of that testimony, so what we have now is newly discovered evidence. Illinois courts routinely recognize that affidavits executed after a trial, even if the person was known beforehand, can still be newly discovered evidence. That makes a difference in the case of Adams, which the state raised in its second motion to cite additional authority. There was an alibi witness. Very different situation. A defendant knows what an alibi witness is going to say. They were with them. They know who they are, where they were, when they were, how long they were. That did not exist for Mr. Washington's case, because he wasn't someone that associated with Mr. Rogers. He was someone that Mr. Heath was with. That's what the affidavit lays out. That makes it a newly discovered. As for conclusive character, it's not the same standard as the Strickland second prong, but there's a lot of similarities. This evidence sets the trial evidence in a brand new light, and taken all together in that new light, it would probably produce a different outcome, because as I discussed earlier, it puts the nine millimeter shell casings that were near the front driver's side door of Mr. Heath's vehicle in a different context. It certainly contradicts Harris's testimony that she did not see Heath with a gun. It contradicts the state theory of the case and corroborates the defense theory of the case that Mr. Rogers, while he did shoot that day, there's no doubt about that. He shot only after bullets came in his direction from a vehicle with multiple people in it, and that's why he fired, and that's why he fled. That casts all the evidence in a brand new light, and that is powerful evidence that a new fact finder, a jury, would find something or a likely different result. Again, certainly don't, at this second stage, don't have to show that he would absolutely be acquitted. It doesn't even have to show that at the evidentiary hearing stage, but this is certainly enough to make a substantial showing that we should get to the evidentiary hearing so Mr. Washington can be examined, cross-examined, and other witnesses as either party sees fit to get to the understanding of the true factual nature of what took place and whether we should go back for a new trial. Yes, your honor. Do you want to address your alternative requests for relief? Briefly, your honor, I wanted to make sure there was no other questions on those first two, then I would certainly turn to the alternative one briefly, your honor. At the very least, if your honors do not want to send this back for an evidentiary hearing, it should go back for additional second stage proceedings for the simple reason the only thing post-conviction counsel really did was advocate incorrectly that forfeiture should be relaxed when that was, as Woods detailed 10 years earlier, not a correct interpretation of current Illinois law and she didn't do nothing to otherwise shape the actual innocence claim into a better form by updating it with legal standards or arguing conclusive character or the newly discovered when there was plenty of case law, as our own briefing acknowledges, that would support that. She was aware that it was newly discovered because she even used that phrase. The statement's response accused her of bootstrapping an actual innocence claim so that phrase was before the court, doing no advocacy is not reasonable assistance. As for the first claim, she got it wrong and she didn't advocate that. If there isn't enough here or your honor has suggested there's a weakness in the affidavit, that's also something that post-conviction counsel is responsible for doing, going back to people who provided affidavits, shoring them up, questioning them, seeing if that could be made stronger to better get to the standards we need. None of that was done and for that reason, your honor, we'd like you to remain in this case for an evidentiary hearing or at the very least for additional second stage proceedings. And that's my order, unless there's any questions, your honors. Okay, looks like the justices have no other questions. Mr. Van Den. Thank you, your honor. Of course, if there's any particular place you would like me to start, please just cut me off, but barring that, I would like to lay out an initial roadmap. So defendant has not made a substantial showing of ineffective assistance to counsel because there was no deficiency. There was no objectively unreasonable performance by trial counsel where investigation was not necessary given the other evidence that would be expected at trial. And this was a sound trial strategy. There was also no prejudice. Mr. Van Den, do you believe that despite information from his client that there's one out there that's willing to testify who saw all of this and who was with the other individual that there's nothing that counsel needs to do? Would that be your argument? Well, I think the nuance here is that given the other evidence in the case, trial counsel was aware of this extensive interview with the ASA that defendant was a participant and defendant repeatedly said that there were only two people. There was only one person he saw flee, and then Glenda Harris, the female occupant of Heath's SUV or Harris's SUV, as it were. And given this, this is a brand new character that in the story that defendant is proposing to his trial counsel actually saw the whole thing. And I think trial counsel knowing the inconsistency that this would present with the rest of the evidence was the entire basis that he made a reasonable decision that that particular investigation was unnecessary. So it's the context of the other evidence in the case. It was against this backdrop that- So you believe that was a strategic decision to simply not even speak with this alleged witness? I think first, even assuming that this witness could be found, you know, defendant did say there's a guy whose name possibly is Frederick Washington. And now I'm telling you, I saw him leave, whereas in the interview, he had said repeatedly that he didn't. So how does counsel determine whether he can be found? And how does the court rule on that when there was no attempt made to find him? Your Honor, I think that may kind of dovetail into the aspect of, well, backing up there is a self-defense, this would be part of a self-defense theory, which trial counsel did not necessarily want to pursue. The record makes clear that trial counsel was much more interested in sticking to a second degree murder or unreasonable belief in self-defense theory. So it was much more low risk, lower risk and the same reward just to present the unavoidable evidence in a fashion that didn't require any particular order of shots fired, any particular anything really. A much more flexible strategy. And I think that was ultimately unsuccessful. I think that is partly borne out in the fact that the court still found first degree murder, even though the trial court acknowledged that it was not conclusive as to the, or the people had not even proven the exact order of the gunshots fired, the number of shooters, the, how many shots were fired and by whom. All of this was secondary to the fact of the mental state that defendant events in his actions. And that was, I think, I think the trial court reached the correct decision with that. But more importantly, I think the, in this context of self-defense now calling Frederick Washington would require trial counsel to square that with these statements by defendant that were admitted at trial and saying, I don't, I heard gunshots. I don't know where they're coming from. I don't even really remember seeing who had a gun, but clearly someone was shooting at me and I fired in the direction that I heard these gunshots. So now a third person coming in and saying, I did see these gunshots. Well, that's great, but there's no nexus to the mental state of a defendant that doesn't change what he saw that changes. Now a third person can corroborate something that trial counsel was already hoping was true, but had no other evidence for. Defendant, I think that does kind of bring me to the point as well. How can, how can defendants say that he had calculated proportionate force when he didn't even acquire a specific target? And this is something that comes up time and time again in the interview and in closing statements that defendant was entirely unsure of who was shooting at him. He just knew he heard gunshots and started firing. That's not a self-defense theory. It could, yes, sir. I didn't say anything. I'm sorry. That does not go to a self-defense theory, which is why I do think that trial counsel's strategy certainly under the Strickland test was defensible and there was no unreasonable, objectively unreasonable performance under the circumstances. I think counsel, isn't it just a basic fundamental question? Defendant tells his counsel, there was somebody else in that car. I think his name is Washington. So this is from the get-go, right? We don't know what else is going to come back, but we are stuck with that presumption that that's true because we're at the second stage and what's in the affidavit is deemed to be true. So if that's true, that from the get-go, defendant says, there is somebody else in that car. His name is Washington. Defendant has no idea what he's going to say. Can a counsel really make a strategic decision at that point to just say that witness isn't going to be important and that witness is going to somehow disrupt what my ultimate theory will be? I think it's important to distinguish that the trial counsel at this stage, pre-trial where he's formulating his strategy is not a post-conviction court sitting at the second stage. He's still making his own determinations as to what gives his client the best chance at an acquittal. And so the context of just this effectively random new evidence, trial counsel can make whatever conclusions he wants as to the credibility of that and put that in the context of how comfortable would I be trying to say this with a straight face at trial, given the other evidence and where a witness's testimony, even when put together with the rest of the trial evidence, cannot establish self-defense, there can't be a reasonable probability that that testimony could have changed the outcome of the trial on self-defense grounds in the context of a first-degree murder charge. Wouldn't competent counsel do a weighing though? Because generally competent counsel would ask, if I go down this road, will it do more harm than good? And a competent counsel would do a weighing there and then decide, okay, well, maybe I need to... And then it becomes a strategic decision too, that maybe I won't pursue this witness because we've already got a plan for this and we're going to be able to prevail here. And in fact, that's exactly what happened with the other four witnesses. That came out, right? Counsel testified and said, we looked into them. We chose not to call them because we thought this was going to be hurtful. Right? So now at this point, all we have is defendant saying, I gave this name and maybe counsel will testify and say, yes, we looked into Washington too. And Washington said nothing. Or maybe he'll say defendant never gave a name. But right now you're asking us to just assume that whatever Washington had to say back then should have been just totally ignored. I'd like to roll back just a little bit too on top of what Justice Walker and Justice Gamerath are saying. You indicated that his attorneys made this decision because they were based on their understanding of the case, the defendant's statement, and that he just began shooting. But in his statement, he said he just started shooting at everybody. His bullets were flying his way. So that was in his statement. So right at the very beginning, he was saying, well, I was shooting back because people were shooting at me. So not following up with this witness, Washington tells me that the attorneys just decided to disregard that part of his statement or didn't think they could win on it or didn't whatever it was. They clearly ignored it because he said right in his statement, bullets were flying his way. Well, I don't carry a gun. Bullets were flying my way. I would just drop to the ground. But he also said he knew that there was a price on his head, and that's why he had the gun. So if bullets are flying my way, I live in that particular neighborhood at that particular time. I know there's a price on my head. It seems pretty reasonable, but his attorney would try to figure out maybe it was self-defense. Let's see what this other guy has to say. You're right. I think that it was essentially trial counsel's approach. I think he got up to the edge of a self-defense claim but knew that not all the elements were there. So he did try to kind of parlay some of these facts into a more open-ended, second-degree murder or unreasonable self-defense approach. And I think as to your quotation, I believe, from the ASA, from defendant's interview with the ASA, there was the line in there that there were bullets flying his way. But if I'm not mistaken, that came in the context of after, I think that was actually sandwiched in between multiple different statements of being directly asked by the ASA, were any bullets, basically that question, were any bullets flying your way? Were there, was anyone shooting at you? Did you even see a gun? And he says over and over, no. And so I think that's what this court was actually, part of what this court was referring to in the opinion on direct appeal when it said that he changed his story in real time during this interview in order to account for ballistics evidence. And I think it's that context that trial counsel would have been aware of in formulating their trial strategy. I'm sorry, if that were, if that was, if we accepted that, then we'd have to accept that if this Washington testimony was that the victim was shooting from the driver's seat and right outside of the driver's seat, and that would explain the .40 caliber bullets that were found by the driver's seat, then what you've just said makes no sense because it is possible if the attorney knew that Washington was going to say that, then he'd be able to explain those .40 caliber bullets. And then he'd be able to explain why the defendant acted the way he did. So I'm just having a real problem with an attorney knowing that there's a person out there who has a, an unknown knowledge about this case and then not pursuing that person to find out what, what do you know, what don't you know, and is it going to be useful to our case or not? So everything that you're saying makes it, you know, sounds great from your point of view, but when you look at it from the defendant's point of view, he's got an attorney, he's got two paid attorneys. They're, they're being paid. He gives them a name, go check this guy out. They don't even do that. I don't see how that, I join my colleagues, I don't see how that can be strategic. Well, Your Honor, first, I think the, I believe all the .40 caliber bullets were from a defendant's gun, which was the only gun. I probably got this mixed up myself. I wrote it down someplace. I not to stop me if I'm starting to belabor this, but I, I believe that then coupled with the evidence that there were no, of course, no guns found in the SUV. There were no bent casings around. The only evidence that a gun was shot in or around or at the SUV was the bullets that were fragments that were embedded in the door. There was no trace of guns being fired, of a gun being fired from his vantage point. And then as to your, I'm sorry, what was the other part of your question? I said, I didn't see how it could be a strategic decision if they didn't talk to him. I was agreeing with my colleagues. Well, I think, I think on that note, as well as Justice Gamera's question, I think that goes to the, the fact that there was a Crankle inquiry in which, of course, it's not, it doesn't matter that he didn't raise this claim at the Crankle inquiry itself, but the entire reason that Crankle inquiries were invented as it were, it was to ask the most basic of questions, get a name out there and say, and ask trial counsel if he had interviewed that person. There didn't need to be, we're skipping ahead if we want to say that the appellate record, he was precluded from even saying Frederick Washington's name at this Crankle inquiry because there was no affidavit yet. You didn't need an affidavit of Frederick Washington in hand to be able to state Frederick Washington's name. So actually there is, there is a fifth person if you're interested and the Crankle court would say, okay, let's, we have that name now, trial counsel, did you ever interview a person by that name? These are all things that could have been raised at the Crankle inquiry. And I think that that certainly would have shed a lot of light on these, these underlying issues of what the interactions were, if any, between trial counsel and, and Frederick Washington. And Washington's own affidavit doesn't shed any light on any such contact either, because he doesn't say whether or if he was contacted by an investigator, by attorney. And I think more importantly, he doesn't say that he would have declined to speak with an investigator or attorney of any kind. So I think that the, these are all things that were specifically, these are kind of issues that were specifically made to be at least initially broached at the Crankle inquiry and develop that record that could be examined on direct appeal. And that's where this Frederick Washington ineffective assistance claim could have first been raised. I agree with that. Like in an ideal world, that's how it should have played out, but it didn't. And your own brief acknowledges that, you know, a petitioner does not forfeit a claim just because it wasn't raised at Crankle. And you're pointing to cases that aren't exactly at the point where courts have held forfeiture. Do you know of any case that has said, if you raise the, you know, kind of like the, the material, the subject matter that's in your own personal knowledge, if you don't raise that altogether at Crankle, then it's forfeited. Um, certainly we don't expect pro se litigants to raise new legal claims. They wouldn't have had all that information, but once you start naming names, is there something different? Is there a case law that would say now he's barred because he specifically named four witnesses back. He didn't name witness five, six, and seven. He can't raise on it. All right. I think that is the, that rationale, uh, would, is the gist of, uh, in people view Yankee, which I say in my brief, um, where he says, um, the court says that, um, defendant is trying to avoid forfeiture of his ineffective assistance claims by, uh, contending that affidavits and support were not created until after the direct appeal, just like in our case, of course. Um, but the court said the underlying issue of, uh, the failure to investigate, you know, that's, what's being challenged. Uh, that was known to defendant, uh, as soon as the trial was concluded and had he raised, uh, had the defendant raised, uh, this claim at the direct appeal, uh, or at least establish enough of a record that it could be resolved on direct appeal. So it's a, you know, there's not a lot of case law on it, frankly, but I, I think that that is the important distinction of, you know, we all agree that you don't need to raise every possible name at a crankle inquiry or forever holds your peace. But when you come back later and try to, uh, raise a post-conviction petition, uh, alleging ineffective assistance on that basis and that's when it comes into play, look, the, uh, crankle inquiry was the vehicle for you to, um, initially raise this. And if your only defense to that is that, well, you didn't yet have, uh, an affidavit, uh, of that witness five, six or seven, uh, in this case, Frederick Washington on hand, um, you know, that you didn't need an affidavit to at least be able to, um, initially broach that. So, um, I, I think that is, uh, consistent with this notion that there is, uh, an Adams, the case that I, um, moved to cite additional authority for as well mentioned that, um, which is a first district unpublished opinion, uh, also mentioned that defendant had had, uh, ample opportunity to raise councils and effectiveness, um, including in a crankle hearing. Again, not that the crankle hearing, uh, is this positive, uh, in itself, but, um, he, when courts are faced with this argument of, uh, this appellate court, I mean, it's based with this argument that, um, the only reason he didn't, uh, raise this claim earlier is because he hadn't successfully located the witness yet, or, uh, maybe had located, but hadn't been able to yet. The fact remains that he could have. The thing is though, Mr., uh, uh, doing with these cases is that very often they are better dealt with, uh, in post-conviction proceedings than they are on direct appeal. And this reminds me of People v. Montgomery, where, uh, the court basically said defense counsel has a duty to conduct a fact, factual and legal investigation and failure to do that, basically what defense counsel is doing is just simply relying on the state's case. And that makes no sense to me. So, I'll give you a chance to respond, but you're, you're coming close to your time now. You've got a few minutes left. Thank you, Your Honor. Um, I'm not, uh, I'm not familiar with Montgomery specifically, but, uh, based on my understanding of the rationale you're describing, um, you know, I do think there is the post-conviction, uh, vehicle and I'm sure it could be a better vehicle, but, um, defendant or, uh, trial counsel's, um, duty at, uh, at that stage is to, uh, make the most, what he feels is the most credible argument he can, um, at trial and to formulate that, uh, in advance. And so, uh, if he feels that, um, investigating a witness who defendant is not even sure what his name is or, and doesn't know what he would say, um, throwing that out there and then seeing if the... That's not the case here. That's not the case here. He, he did give the name. Well, the, the affidavit said that, uh, there's a person in, there's a third person in Heath SUV that, uh, whose name possibly was Frederick Washington, uh, and I don't want to make inappropriate inferences, but I think a basic inference to be made on the face of that is that they're, uh, the only thing that, uh, the only identifier that defendant, um, had, uh, given for, uh, this Frederick Washington was a name and he wasn't even sure of that. You know, there's no... Right, but that was a, that was also a pro se affidavit, correct? Yes, Your Honor. Yeah. So, I mean, pro se litigants with no, uh, legal background and maybe minimal education, they're doing the best they can do. It's not going to be perfect, but as counsel, I believe Mr. Evers stated earlier, that's part of the job of defense counsel to make sure that things are in proper and in order. Well, I think the issue there would just be the, uh, a vermin of saying what you think he would have saw. I don't, I don't think that's a matter where, uh, counsel or quality of counsel is involved. You just, if you're saying that there's another witness out there, you just say everything that you know and, uh, everything that you recall to the best of your knowledge and then have your, um, counsel go try to find that person. Um, but there's no discussion of that. And so I think, um, when you couple this with the fact that, uh, at the end of this affidavit by Frederick Washington, Keith hasn't even, uh, shot yet. He ran away before that point. Um, so we know that Washington, according to this, saw some shooting, but he didn't see the shooting. And that's, um, in, in short why, um, I did emphasize in, in some cases that I moved, uh, to cite additional authority for that, that is a key, uh, element of self-defense. Um, of course, this now goes back to, um, their, uh, the deficiency of ineffective assistance as well as the, uh, conclusive character of the affidavit. Um, because nothing in the, nothing that, uh, defendant averse that he presented his trial counsel with, uh, pretrial makes it so that, uh, Frederick Washington even saw the victim. I'm trying not to interrupt you, but you're not giving me any pauses because you, you're already over time, but I want to give you a chance to conclude. So go ahead. You are, I would just conclude, uh, and I apologize. I would just conclude by, um, emphasizing the, um, the lack of, uh, basis that this, uh, Frederick Washington's affidavit when combined with the other evidence at trial, um, is so short, also short of establishing conclusive character that is not a different light. Um, a reasonable juror would not convict based on, uh, the, or accept his self-defense affirmative defense based on the testimony who first of all, didn't even see the victim get shot. And so, um, I think for all of these reasons, um, uh, and more, uh, that could be stated that the people would be asking this court to affirm the lower courts, uh, judgment, dismissing the petition at the second stage. Mr. Evers, you have three minutes that you say for a rebuttal. Thank you, your honor. Very brief. I want to address the crankle inquiry and then some of the allegations of the strategy. Uh, Justice Gimroth, you had asked the question about, are there other authorities that talk about this forfeiture? Just last week, the Wednesday before Thanksgiving, the Illinois Supreme Court in the case of people we learn on, line on, granted, uh, leave to appeal on this very issue. On one side is the unpublished decision, including Wanky, uh, cited by the state. And on the other side is the public decision for McGee, uh, which I cited, both from the second district, that there is competing issues in that. So that, that PLA and its grant summarizes essentially the four or five cases that are at odds on this issue. But as for, and I, we agree with McGee, it doesn't make a lot of sense as Wood described 10 years ago to put that kind of burden on a pro se defendant, especially without admonishments. We give defendants notice if they are going to take actions that are going to have repercussions long down the road. And nothing like that ever happens with these crankle hearings or pro se motions, which is the reason it should fail for other reasons we've discussed in our briefing. As for strategy, there is no strategic reason not to learn about what a potential eyewitness says. The trial took place four and a half, more than four and a half years after the shooting, plenty of time to investigate and to say that an eyewitness wouldn't help understand who shot first because contrary to what the state said, Mr. Washington did see the shooting. He saw Heath reach into his waistband, draw a gun, shoot while driving, try to do a U-turn crash, exit his car from the driver's side where there are grouping of six nine millimeter shell casings from a gun that was never found. And that evidence, which we take as true because of the second stage is something that would have been, it's prejudicial not to be there, but also would have been strategic to know. So to guess that an eyewitness who saw the shooting wouldn't be able to give indication of a self-defense or an unreasonable belief in self-defense doesn't make a lot of sense, just for the simple reason that knowledge is power. If they never wanted to know what he said, they didn't investigate, but there's nothing to be gained by not knowing what he might say, especially if he comes forward in the state interviews at one point. That wasn't strategic because they simply didn't know. Keeping yourself ignorant isn't a strategic decision that aids the client. And that's the failure here. With that, your honors, I would ask you just urge to reverse the lower court and remand this case for evidence on both the actual innocence claim and the ineffective assistance claim. Since as we are at the pleading stage here, both of those claims can be supported by the same affidavit of Mr. Washington. Thank you. Unless there's any questions, I will end my time. Thank you both. We do appreciate your excellence. You both did a very good job at arguing your case, and we do appreciate that. Have a good day, and thank you. Thank you. Justice Walker, could I just ask, counsel, what was that TLA that was granted? Certainly, your honor. So it is, people will be lining, the Supreme Court number is 132043. Thank you. Thank you. Have a good day. Thank you.